# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZIAD AKL, MD ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-0461 (RBW) |
| ) | |
| HONORABLE MICHAEL LEAVITT, ) | |
| ) | |
| Defendant. ) | |
| ————————————————) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff, Ziad Akl, M.D., *pro se*, hereby opposes Defendant's Motion To Dismiss Or In The Alternative For Summary Judgment (the "Motion") and requests that the Court deny the Motion.

A supporting memorandum of points and authorities, a statement of material facts in dispute and a proposed order are attached.

Respectfully submitted,

Ziad Akl, M.D., F.A.C.P.
10410 Glen Road
Potomac, MD 20854
*Pro se*

# RECEIVED

### AUG 29 2008

### Clerk, U.S. District and Bankruptcy Courts

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ZIAD AKL, MD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0461 (RBW) |
| | ) | |
| HONORABLE MICHAEL LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff, Ziad Akl, M.D., *pro se*, hereby submits this memorandum in support of his opposition to Defendant's Motion To Dismiss Or In The Alternative For Summary Judgment (the "Motion").

## FACTUAL BACKGROUND

Plaintiff disputes Defendant's version of the facts as narrated in the Motion and refers the Court to Plaintiff's First Amended Complaint.

Plaintiff is a Board-certified Infectious Diseases specialist licensed to practice Medicine in the District of Columbia, Virginia and Maryland. Plaintiff obtained clinical privileges at Virginia Hospital Center-Arlington Health System (the "Hospital") in or about September 2000. In March 2003, two nurses (the "Nurses") combined together and brought false accusations of harassment against Plaintiff after failing to obtain his attention. After their complaints, the Nurses engaged in a continued attention-seeking behavior towards Plaintiff, who was under strict orders not to make any contact with them outside of patient care. The Nurses' behavior was harassing to Plaintiff and jeopardized the quality of care he rendered. Plaintiff repeatedly reported the Nurses' actions to the Citizenship Committee of the Hospital; however, the Citizenship Committee and the Hospital failed to take any

remedial action against the Nurses while claiming to Plaintiff, including in writing, that they did. The Hospital was in fact attempting to protect the Nurses because one of them, Laura Pedersen, the main inciter in this matter, was having an extra-marital affair with M. Anthony Casolaro, MD, Chairman of the Department of Medicine, a member of the Citizenship Committee and a direct supervisor of Plaintiff's. As the harassing behavior of the Nurses towards Plaintiff continued, Plaintiff informed the Citizenship Committee of his knowledge of the conflict of interest that existed in the fact that Dr. Casolaro was involved with nurse Pedersen, was revealing confidential information to her and was directly executing her wishes. Plaintiff also requested a hearing on the charges against him and expressed his intention to file a lawsuit. In an act of extortion and in a desperate attempt to intimidate Plaintiff and make him back off, James Cole, President of the Hospital, summarily suspended Plaintiff's clinical privileges under the excuse of "disruptive behavior." The Medical Executive Committee ("MEC") then proceeded to meet in the presence of "select" members and decided in secret to revoke Plaintiff's medical staff appointment *no matter what*, without going through the proper procedures required by the Medical Credentials Policy. For that purpose, an Investigative Committee was created that only met with Plaintiff, forged minutes of other meetings with other witnesses and forged a report that it allegedly submitted to the MEC recommending revocation of Plaintiff's medical staff appointment. The MEC failed to hear Plaintiff although it had informed him that it would, and allegedly proceeded to vote for revocation of his appointment. A subsequent hearing requested by Plaintiff was closer to a Soviet-style trial, where Plaintiff was denied the right to discovery, to call witnesses, to be properly represented by counsel, or to testify. Not surprisingly, the Hearing Panel upheld the recommendations of the MEC. Plaintiff appealed the decision to a three-member Review Panel supposedly appointed by the Chairman of the Board of Directors of the Hospital. The Review Panel, which was fictitious, "upheld" the previous decisions to revoke Plaintiff's

appointment. The Board of Directors then, through a vote that never occurred, "revoked" Plaintiff's appointment. The various Hospital officials were acting under the impression that they enjoyed absolute immunity and under the false belief, spurred by the Hospital attorney's assertions, that Plaintiff would never bring legal action. The Hospital also filed defamatory reports about Plaintiff with the Virginia Board of Medicine and the National Practitioner Data Bank, practically foreclosing Plaintiff's ability to obtain privileges in any hospital nationwide.[1] *See* Cooper v. Delaware Valley Medical Center., 539 Pa. 620, 628-29, 654 A.2d 547, 551 (1995) (noting that finding gainful employment in the hospital setting after a poor review is unlikely as a result of the provisions of the Health Care Quality Improvement Act). *See* also Hayes v. Mercy Health Corporation, 1999 Pa. LEXIS 2976; 559 Pa. 21; 739 A.2d 114. Of note, none of the Boards of Medicine in the states where Plaintiff is licensed, namely Virginia, Maryland and the District of Columbia, has declined to renew Plaintiff's license or has taken any action against Plaintiff, despite their full knowledge of the facts.

Plaintiff has filed three suits against the Hospital and various individuals in Virginia state courts. Plaintiff was forced to voluntarily dismiss the three lawsuits, which were consolidated in the Arlington County Circuit Court, after indisputable evidence showed bias against Plaintiff by the court. Subsequently, Plaintiff has attempted to obtain relief in other forums, however, each and every lawsuit filed by Plaintiff has been dismissed summarily without due consideration by the courts. As a clear example of such lack of consideration, the Court is referred to the memorandum opinion of the United States District Court for the District of Maryland, attached by Defendant to its Motion as Exhibit 1.

In sum, a hospital took advantage of the immunity provided by HCQIA to retaliate against Plaintiff for refusing to remain silent to the hospital's failure to take action against two nurses jeopardizing his career, while at the same time it was taking action against

---

[1] Plaintiff is an Infectious Diseases specialist whose practice is mostly hospital-based.

3

Plaintiff. The Hospital delegated the peer review to its attorney who was so confident of the hospital's immune status and that Plaintiff would not take legal action that he forged the whole peer review. When Plaintiff brought suit, the attorney was fired after almost 15 years in service at the hospital. Despite the immunities and privileges, Plaintiff was able to prove the forgery because of the great extent to which the attorney had gone in his acts. The Hospital, recognizing the seriousness of its acts, was successful in recruiting a visiting judge to rule in its favor in defiance of all reason or law and to usurp the case from other judges by appointing himself presiding judge.[2] Further, Plaintiff's efforts to correct the record that is maintained by the Government concerning him have been stonewalled by an agency that, while created to protect the public, has effectively turned itself into a false witness to egregious acts continually occurring nationwide, intentionally refusing to abide by minimal statutory requirements to protect individual rights.

## STATUTORY AND REGULATORY BACKGROUND

In 1986, Congress enacted the Health Care Quality Improvement Act ("HCQIA") of 1986 (Title IV, Pub. L. No. 99-660), which established the National Practitioner Data Bank (the "Data Bank" or the "NPDB"), 42 U.S.C. §§ 11101-52. This legislation was intended "to improve the quality of medical care" by restricting "the ability of incompetent physicians to move from State to State without disclosure or discovery of ... previous damaging or incompetent performance." Motion at 2. It is mandatory for hospitals to report any professional review action that adversely affects the clinical privileges of a physician for more than 30 days, or the acceptance of the surrender of such clinical privileges while the physician is under investigation by the hospital for alleged incompetence or improper professional conduct. Motion at 3. Hospitals must query the Data Bank every time a

---

[2] Unlike the practice in this Court, the Arlington County Circuit Court does not appoint a judge randomly at the filing of a lawsuit; rather, any judge may acquire a case when he so wishes.

physician applies for clinical privileges or is placed on staff. Id. The Data Bank regulations state that any physician who is the subject of a report to the Data Bank may challenge the accuracy of the information in the report. The regulations permit the practitioner to dispute the factual accuracy of the reported information and also whether the report was filed in accordance with the Data Bank's reporting requirements, including the eligibility of an entity to report to the Data Bank. Motion at 4. Disputing the accuracy of Data Bank reports is a multi-step procedure which is set out in the Data Bank regulations. When a report is filed with the Data Bank, the Data Bank mails a Practitioner Notification Document containing pertinent information to the practitioner who is the subject of the report. The practitioner then has 60 days to request that the report be placed in "disputed" status. To initiate the dispute, the practitioner must bring the alleged inaccuracy to the reporting entity's attention and request a correction. The reporting entity must then void the report or correct any inaccuracy. If the reporting entity does not void or correct an inaccuracy to the practitioner's satisfaction, then the practitioner may request that the contested information be placed in a "disputed" status category and appeal to the Secretary for review of the information. Id.

## FACTS ABOUT HCQIA AND THE DATA BANK

Since HCQIA went into effect in 1989, thousands of adverse reports have been filed with the Data Bank. Unfortunately, a large number of the actions reported have been taken maliciously by hospitals and their Medical Staff against the subjects of the peer review. The motives are usually anti-competitive in nature, but also include retaliation against whistleblowers, racial animus, personal spite, and even disputes over a parking space. This process has been dubbed sham peer review or bad-faith peer review, has now become a powerful weapon in the hands of hospitals and those physicians who hold the political power in hospitals, and is being misused nationwide. Many lawsuits against the perpetrators have been filed by the victims, but very few of them survived summary judgment because of the

immunity provided by HCQIA and because the conditions that need to be fulfilled for a peer review to be considered adequate, as defined by HCQIA, are very vague and subject to (different) interpretation by the Courts. *See*, e.g., <u>Odom v. Fairbanks Memorial Hospital, No. 4FA-93-2901, at 2 (4th Judicial District at Fairbanks, Alaska, 2001)</u>[3] ("[HCQIA] has been the subject of numerous idiosyncratic interpretations in the federal courts and the courts of other states.". *See also* <u>Brown v. Presbyterian Healthcare Services, 101 F.3d 1324</u>; <u>Clark v. Columbia/HCA Info. Servs., 117 Nev. 468; 25 P.3d 215</u>. The recent award of $366 million to a physician by a federal jury in Texas for a single bad-faith peer-review highlights that this practice is adding tremendous cost to healthcare (although the award was decreased to $22 million on remittitur). See <u>Poliner v. Texas Health Systems et al., 2006 WL 770425, U.S. Dist LEXIS 13125 (N.D.Tex. Mar. 27, 2006)</u>.

Lawyers that dealt with 4-5 cases of bad-faith peer review a year now commonly deal with 2-3 cases *a month.* Bad-faith peer review does not affect only physicians; all of society is badly harmed when hospitals silence their doctors, impair medical care and essentially destroy the system designed to protect patients. Verner Waite, MD, FACS, founder of the Semmelweis Society International, a non-profit organization dedicated to fighting such practices, personally reviewed more than 1000 cases of physician peer-review, and determined that at least 80% of peer reviews are performed in bad faith, for economic or other reasons. His is the most comprehensive review currently known. It finds that due process in peer review is the exception, rather than the rule. It is rare to find any hospital that uniformly applies standards of peer review to the members of its hospital staff. As a result, thousands of physicians have lost their careers without any due process. Bad-faith peer review against one physician can silence hundreds of physicians and place physicians' livelihoods at extreme risk. It is estimated that 9 out of 10 physicians exposed to bad-faith

---

[3] Attached hereto and incorporated herein as Exhibit 1.

peer review never work again as physicians. It is also estimated that a substantial number of physicians exposed to bad-faith peer review commit suicide. In one extreme instance, a white physician in a southern state was terminated by a hospital through such practice for inviting black children, among others, to a house party. His own children were then taken by law enforcement into custody after the hospital filed false claims of child molestation against him; his daughter was raped while in custody; and his wife committed suicide. Numerous physicians have similarly committed suicide because of such practices.

One Justice on the Nevada Supreme Court noted that HCQIA can sometimes be used, "not to improve the quality of medical care, but to leave a doctor who was unfairly treated without any viable remedy." That Justice also stated: "basically, as long as the hospitals provide procedural due process and state some minimal basis related to quality health care, whether legitimate or not, they are immune from liability. Unfortunately, this may leave the hospitals free to abuse the process for their own purposes." Meyer v. Sunrise Hosp., 22 P.3d 1142 (Nev. 2001).

Reviewers set up a double standard of covering up the real mistakes of their friends and exposing their politically vulnerable colleagues for non-substantial, flimsy, clinically insignificant, bogus and fabricated reasons. The basic concept that an elite group of physicians who depend on each other and the system for their bread and butter will demonstrate enough courage to criticize and discipline other members of their elite group is plain ludicrous. The main result of HCQIA has been to marginalize some of the most competent and most quality-concerned physicians, driving them out of practice or terminating their lives through suicide. At the same time, the medically incompetent, the advocates of continued poor-quality and the most financially driven are allowed to run this Nation's hospitals; all because the provisions of the Health Care Quality Improvement Act allow them to so do. And then we ask: why are 100,000 people dying every year from medical errors?

It's because behind the smoke screen of every one physician targeted by sham peer-review, there is a dozen physicians whose medical errors are quietly shoved under the rug. Therein lies the real source of threat to public health, as well as the injustice to those individual physicians who become sacrificial lambs.

Peer review is part of a system intended to protect patients; if this has been warped, patients are at risk. Effective medical peer review is (or rather can be) the ultimate protector of public health; however, in its current secretive form, it invites abuse. There is much reason to believe, as elucidated above, that peer review is practiced more in its corrupt form rather than for its original established purpose. The situation with medicine today is reminiscent of the days when scientists of cigarette companies did their own research and declared that cigarettes did not cause cancer.

The Data Bank collects information about practitioners from hospitals and other institutions. Although the Data Bank claims that it makes reasonable efforts to ensure that its records are accurate, the standards it set for such efforts are unreasonable and disregard individuals' constitutional rights. Further, although the Data Bank claims to adhere to the provisions of the Privacy Act (the "Act"), it clearly does not do so despite a declaratory order from this Court. In a U.S. General Accounting Office report dated November 2000 on the NPDB, entitled National Practitioner Data Bank, Major Improvements Are Needed To Enhance Data Bank's Reliability, the following conclusions were made: An analysis of 252 reports of state licensure actions revealed that 11 percent contained inaccurate or misleading information on the severity or number of times practitioners had been disciplined. Inaccurate information was also found in about one-third of the 79 clinical privilege restriction reports reviewed. Reports from state licensing boards and health care providers were, at times, untimely, inaccurate, or submitted in duplicate, which made it appear that twice the number of disciplinary actions against a practitioner had been taken. Moreover, when mistakes were

8

made, practitioners had difficulty getting the reported information corrected. Officials from the U.S. Department of Health and Human Services ("HHS" or "DHHS") cited practitioner notifications and the dispute resolution process as two control mechanisms that ensure the accuracy of information reported to the NPDB. However, the analysis of reports submitted to the Data Bank and the results of the GAO queries for information on particular practitioners suggested that these controls have not prevented erroneous information from remaining in the data bank once it was reported. One NPDB Executive Committee member that GAO officials spoke with stated that it is very difficult to get information in the Data Bank corrected.

## PROCEDURAL BACKGROUND

Plaintiff filed this suit on March 18, 2008 and his First Amended Complaint ("Am. Comp.") on April 8, 2008, prior to any response by Defendant. Defendant filed his Motion on August 1, 2008 after obtaining an extension of time to respond from the Court. The Court also graciously granted Plaintiff an extension of time to respond to the Motion until August 29, 2008. Thus, this brief is timely.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only include in his complaint "a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (alteration in original) (internal quotation marks omitted); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). Moreover, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson 127 S. Ct. at 2200. A motion to dismiss under Rule 12(b)(6) tests not

whether a plaintiff will ultimately prevail on the merits, but only whether the plaintiff has properly stated a claim for which he is entitled to relief. Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000).

Defendant moves in the alternative for summary judgment. Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must review the facts in the light most favorable to the non-moving party in making this determination. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once a motion for summary judgment has been properly made and supported by evidence, the non-moving party must then demonstrate the existence of a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (citing Fed. R. Civ. P. 56(e)). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id. at 255.

## ARGUMENT

A. Exhaustion of remedies:

Defendant, moving to dismiss Count I, argues that prior to bringing a lawsuit seeking amendment of records under the Privacy Act, plaintiffs must first exhaust their administrative remedies, and that Plaintiff's Complaint does not contain facts sufficient to establish that he

has satisfied the Privacy Act's exhaustion requirements. Defendant states that first, the individual must request amendment under section 552a(d)(2) of the Privacy Act, which requires each agency that maintains a system of records to "permit [an] individual to request amendment of a record pertaining to him." 5 U.S.C. § 552a(d)(2). The second step, according to Defendant, is for the individual to request a second level of review under section 552a(d)(3), which allows parties to obtain a review of the original decision by an agency official. 5 U.S.C. § 552a(d)(3). Finally, Defendant concludes that the Complaint does not contain facts sufficient to establish that Plaintiff has satisfied the Privacy Act's exhaustion requirements. In support of its argument, Defendant states that Plaintiff "initiated a dispute regarding Amended Report No. 2," and that the Amended Complaint contains no such allegations regarding "Amended Report No. 1."

In Nagel v. United States Department of Health, Education and Welfare, 233 U.S. App. D.C. 332, 725 F.2d 1438 (D.C. Cir. 1984), the Court of Appeals for the District of Columbia determined that exhaustion of administrative remedies is a prerequisite to bringing a civil suit under the Privacy Act to compel amendment of records maintained by a federal agency on the grounds that they are not accurate, relevant, timely, or complete.

In his First Amended Complaint, at ¶ 37, Plaintiff stated:

On March 21, 2006, the Hospital voided Report No. 2 and replaced it with a more detailed one (Adverse Action Report 5500000041115021) ("Report No. 3").

However, in its Motion, at 5, Defendant states:

On March 21, 2006, the Hospital replaced Report No. 1 with a more detailed report ("Amended Report No. 1"). Am. Compl. ¶ 37.

Defendant refers the Court to Plaintiff's Am. Comp. at ¶ 37, but that paragraph states that the Hospital voided Report No. 2, *not* Report No. 1, as Defendant claims. Thus, Plaintiff and the Court are left to try and guess what is referred to by Defendant as "Amended Report No. 1," which Defendant claims Plaintiff did not dispute. If Defendant refers to Report No. 3,

11

Plaintiff did allege that he initiated a dispute concerning that Report. Am. Comp. ¶ 38. If Defendant refers to Report No. 4, the fact that Plaintiff disputed that report can be clearly inferred from the face of the Amended Complaint. The fact that Plaintiff did not assign a specific paragraph to state that he disputed Report No. 4 is of no moment. At ¶ 39 of the Am. Comp., Plaintiff stated that he "contests the accuracy and completeness of [Report No. 4]." At ¶ 40, Plaintiff stated that "[b]y letter dated May 25, 2006, the NPDB informed Plaintiff that it elevated Report No. 4 to Secretarial Review." At ¶ 41, Plaintiff stated that "[he] has provided the NPDB with evidence demonstrating the inaccuracy and incompleteness of Reports 1 through 4. At ¶ 43, Plaintiff stated that "[o]n June 9, 2006, the Secretary completed its review of Report No. 4 and found it to be "accurate, complete, timely and relevant for agency purposes."" At ¶ 44, Plaintiff stated that "[he] contests the accuracy and completeness of Reports No. 3 and No. 4.

Even Defendant states that "Plaintiff sought review of Amended Report No. 1 and Amended Report No. 2" and "[d]uring its review of Amended Report Nos. 1 and 2, the Data Bank found both reports to be accurate, complete, timely and relevant for agency purposes." *See* Defendant's Statement Of Material Facts As To Which There Is No Dispute, at ¶¶ 11-12. *See also* Declaration of Robert E. Oshel, Ph.D., attached to Defendant's Motion, at ¶¶ 7-8. ("Amended Report No. 1 and Amended Report No. 2 were reviewed in the Secretarial Review process.")

"All pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(f). In deciding a 12(b)(6) motion, a court "constru[es] the complaint liberally in the plaintiff's favor," "accept[ing] as true all of the factual allegations contained in the complaint," Kassem v. Wash. Hosp. Ctr., No. 06-7161, 513 F.3d 251, 2008 U.S. App. LEXIS 1174, at *2 (D.C. Cir. Jan. 22, 2008), "with the benefit of all reasonable inferences derived from the facts alleged," Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169,

173 (D.C. Cir. 2006). It is clear, thus, to the extent that Defendant refers to Report No. 4, that Plaintiff did allege that he disputed said Report. If, however, the Court still finds that Defendant's argument has any merit, Plaintiff requests leave to amend his Complaint to literally state that he disputed Report No. 4. It would be, however, a waste of judicial resources to go through the exercise of dismissing that part of the Complaint that seeks relief in connection with Report No. 4 and to allow Plaintiff to amend his Complaint to make a literal allegation.

Defendant argues next that Plaintiff did not appeal the determination regarding Amended Reports No. 1 and 2 and that the agency advised him of his appeal rights. Defendant supports this allegation by an affidavit submitted by Dr. Robert Oshel, Associate Director of the Division of Practitioner Data Banks.

5 U.S.C. § 552a(d)(2)(B)(ii) states that each agency that maintains a system of records shall "inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official[.]" 5 U.S.C. § 552a(d)(3) states that each agency that maintains a system of records shall "permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the

individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section[.]"

Defendant's argument that it informed Plaintiff of his appeal right borders on fraud upon this Court, because the Data Bank does not even have an appeal process in place. In its Motion, Defendant refers to 45 C.F.R. § 60.14 as the regulations governing the dispute process. Said section of the Code of Federal Regulations states:

How to dispute the accuracy of National Practitioner Data Bank information.

(a)    Who may dispute National Practitioner Data Bank information.
Any physician, dentist or other health care practitioner may dispute the accuracy of information in the Data Bank concerning himself or herself. The Secretary will routinely mail a copy of any report filed in the Data Bank to the subject individual.

(b)    Procedures for filing a dispute.
A physician, dentist or other health care practitioner has 60 days from the date on which the Secretary mails the report in question to him or her in which to dispute the accuracy of the report. The procedures for disputing a report are: (1) Informing the Secretary and the reporting entity, in writing, of the disagreement, and the basis for it, (2) Requesting simultaneously that the disputed information be entered into a "disputed" status and be reported to inquirers as being in a "disputed" status, and (3) Attempting to enter into discussion with the reporting entity to resolve the dispute.

(c)    Procedures for revising disputed information.
(1) If the reporting entity revises the information originally submitted to the Data Bank, the Secretary will notify all entities to whom reports have been sent that the original information has been revised. (2) If the reporting entity does not revise the reported information, the Secretary will, upon request, review the written information submitted by both parties (the physician, dentist or other health care practitioner), and the reporting entity. After review, the Secretary will either—(i) If the Secretary concludes that the information is accurate, include a brief statement by the physician, dentist or other health care practitioner describing the disagreement concerning the information, and an explanation of the basis for the decision that it is accurate, or (ii) If the Secretary concludes that the information was incorrect, send corrected information to previous inquirers.

As shown, there is no appeal process provided by the Code. After review, if the Secretary finds that the information is accurate, he will include a brief statement by the physician and an explanation of the basis for the decision that it is accurate. That is where the process ends. Defendant tries to get around this deficiency by misrepresenting what the Code

14

states. In its Motion, at 4, Defendant states that "[i]f the reporting entity does not void or correct an inaccuracy to the practitioner's satisfaction, then the practitioner may request that the contested information be placed in a "disputed" status category and appeal to the Secretary for review of the information." The "appeal" that Defendant cites *is no more than the review* referred to by <u>45 C.F.R. § 60.14</u>. Nowhere does said section refer to an appeal process after the initial review.

Even more fatal to Defendant's assertions is the NPDB Guidebook (the "Guidebook"), which "reflects the entire range of NPDB policies and operations, including those that have changed or expanded since the NPDB opened in September 1990."[4] The Guidebook states:

> Reconsideration of the Secretary's Decisions on Disputes:
> Although HHS <u>does not have a formal appeals process</u> for reconsideration of the Secretary's decisions on disputes, HHS does review such requests. The subject must submit a written request for reconsideration to the office that issued the Secretary's determination. The subject should be specific about any new information that was unavailable at the time of Secretarial Review and which issues the practitioner believes were not appropriately considered during the review process. The Secretary will either affirm the prior determination or issue a revised finding. HHS, however, <u>gives priority to initial requests for Secretarial Review</u>. (emphasis added)

Exhibit 2, at F-6. There can be no stronger evidence that Defendant's claims are deceptive than Defendant's own stated procedures. In its own words, Defendant does not have an appeal process in place, contrary to the requirements of the Privacy Act. All what Defendant has in place is a procedure for reconsideration of the initial decision, where Defendant "gives priority to initial requests for Secretarial Review," and where the reconsideration is handled by the same individuals that handled the initial review. In Defendant's own words, there is no appeal process. Indeed, all what Plaintiff was offered was a "reconsideration" *by the same individuals* who made the first determination. Defendant's position is that although it does

---

[4] *See* Exhibit 2, National Practitioner Data Bank Guidebook, attached hereto and incorporated herein as Exhibit 2, at A-1. The full Guidebook is available at http://www.npdb-hipdb.hrsa.gov/pubs/gb/NPDB_Guidebook.pdf

not have an appeals process in place, if the subject of a report is to bring a Privacy Act suit, he or she must appeal nevertheless, and if no appeal is taken, the suit must be dismissed. This position falls nothing short of bizarre.

Defendant has to decide whether it has an appeal process in place or not; in the meantime, it is estopped from raising the exhaustion argument. Plaintiff cannot be penalized for bypassing a procedure that does not exist.

It is within the discretion of the Court to waive the exhaustion requirement where there has been a denial of meaningful access. Harper v. Kobelinski, 191 U.S. App. D.C. 198, 589 F.2d 721 (D.C. Cir. 1978). In Harper, the Court of Appeals for this Circuit determined that this Court should retain jurisdiction over a case where a plaintiff was never informed of his appeal right. In the present case, Plaintiff was not and could not have been informed of his appeal right because there is no appeal process in place, and any request for appeal would have been futile.

In Doe v. Thompson, 332 F. Supp. 2d 124, 133 (D.D.C. 2004), this Court issued a declaratory order which concluded that the additional protections of the Privacy Act apply to the Health Care Quality Improvement Act.[5] The Privacy Act provides, under 5 U.S.C. § 552a(f)(4), that each agency shall "establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under [the Act]." However, since the issuance of this Court's order, HHS has not made any changes to its procedures, and continues to skirt various provisions of the Act. The following regulations are examples of the violations that continue to occur:

---

[5] See Order dated July 30, 2004, attached hereto and incorporated herein as Exhibit 3.

1)     In the section on Secretarial Review, the Guidebook states that the documentation submitted by the subject of a disputed report may not exceed 10 pages, including attachments and exhibits, although no such limitations are imposed by the Privacy Act. *See* Exhibit 2, Guidebook, at F-3.

2)     The subject of a report has 60 days from the date on which the Secretary mails the report in question to him or her in which to dispute the accuracy of the report. 45 C.F.R § 60.14(b). No such limitation is imposed by the Privacy Act.

3)     The Privacy Act explicitly requires an agency to "promptly" take action on a request for amendment, 5 U.S.C. § 552a(d)(2)(B), yet the Data Bank routinely informs practitioners that a case may take "several months" to review.

4)     The Privacy Act requires that prior to disseminating any record about an individual to any person other than an agency, each agency that maintains a system of records make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes. 5 U.S.C. § 552a(e)(6). However, the Data Bank still reviews its records "only for accuracy." *See* Exhibit 2, Guidebook, at F-1.

5)     The Privacy Act requires that prior to disseminating any record about an individual to any person other than an agency, the agency maintaining the record make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes. 5 U.S.C. § 552a(e)(6). However, the Data Bank's stance is that, after a request for correction is filed, it may continue to disseminate a record prior to making reasonable

efforts to assure that the above requirements are met because such dissemination "will in no way prejudice [the practitioner's] interests since any entity authorized to query on [the practitioner] would in its own application process invariably require [the practitioner] to disclose clinical privileges actions taken or pending against him." Besides the fact that this excuse is meritless and that the assertion has no legal basis, such stance is extremely prejudicial because it forces a practitioner whose information with the Data Bank is inaccurate to either make the same inaccurate (and perhaps false) statements to the entity or risk committing perjury.

6)    The Privacy Act mandates an appeal process, but the Data Bank still has not implemented one.

7)    The Privacy Act requires that, upon refusal to amend a record, each agency notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of the Act. The Data Bank provides no such notice.

8)    The Privacy Act does not allow for an agency not to correct a report based on the fact that it is "outside the scope of its review." The Data Bank routinely evades responsibility by advancing this reason.

In Doe, this Court stated that "it is readily apparent that the NPDB procedures provide less protection than the procedures required by the Privacy Act[;]" Doe at 130, and that "the DHHS' regulation which applies to the NPDB fall short of providing an individual with the same level of protection afforded by the Privacy Act…". Id. Despite the Court's statements and the Court's order, HHS has not made any change to the procedures by which it handles its records. An agency acts in an intentional or willful manner "either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights

under the Act." <u>Deters v. U.S. Parole Comm., 85 F.3d 655, 660 (D.C. Cir.1996)</u> (quoting <u>Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984)</u>). By disregarding this Court's order, the Data Bank has intentionally and willfully disregarded the rights of every individual who has ever disputed a report. To conceal its defiance of this Court's order, the Data Bank plays on words and attempts to convince this Court that it has an appeal process in place and that it invited Plaintiff to take such appeal. It did not.

In <u>Leighton v. Central Intelligence Agency, 412 F. Supp. 2d 30, 35 (D.D.C. 2006)</u>, the court stated that "[t]he judicial review provision [5 U.S.C. § 552a(g)(1)] identifies subsection (d)(3) [of 5 U.S.C. 552a] because it contemplates that an individual bringing suit has exhausted his or her administrative *appeal*." (emphasis added). In <u>Dickson v. OPM, 264 U.S. App. D.C. 182, 828 F.2d 32, 40 (D.C. Cir. 1987)</u>, the court stated that "[t]he requisite next step would have been *higher level* review of the agency determination, <u>5 U.S.C. § 552a(d)(3)</u>, after which appellant, if still unsatisfied, would have exhausted his search for an administrative remedy and been entitled to seek injunctive relief in the district court. <u>5 U.S.C. §§ 552a(g)(1)(A), (2)(A)</u>." Clearly then, <u>5 U.S.C. § 552a</u> establishes a distinct second-level appeal process, not a process by which an individual may ask the same individuals to reconsider their decision and where priority is given to initial requests for Secretarial Review.

As such, Plaintiff denies and disputes Defendant's and Dr. Oshel's assertions that he was informed of his right to appeal the decision not to amend the reports. Seeking agency reconsideration by no means amounts to an appeal. This fact is admitted by the Data Bank itself in its Guidebook, where it stated that it does not have a formal appeals process. Exhibit 2, Guidebook at F-6. Further, Plaintiff found it futile to seek reconsideration, as directed by the Data Bank, based on "new information" or "issues that were inappropriately considered," and because of the Data Bank's obvious bad faith and unlawful conduct. Defendant's

position is equivalent to stating that a losing party in court can only file a motion for reconsideration with the same judge and cannot file an appeal with the appellate court.

The issues raised by Plaintiff -- whether the Data Bank has an appeal process in place and whether Plaintiff was informed of such appeal right -- are genuine issues of material facts sufficient to withstand a motion for summary judgment. Defendant's argument is vacuous and its request for dismissal of Count I should be denied.

B. Statute of Limitations:

Defendant argues that Counts II and III are barred by the statute of limitations. Defendant states that Plaintiff "appears" to seek damages for Defendant's alleged failure to correct both the original and "amended versions" of Reports No. 1 and 2. This statement is incorrect. It is clear from Plaintiff's Amended Complaint that Plaintiff is seeking damages in connection with the reports *maintained* by DHHS, i.e. Reports No. 3 and 4.

In Count II, Plaintiff stated that DHHS maintains records about Plaintiff which are neither accurate nor complete, and that DHHS has willfully and intentionally failed to make reasonable efforts to assure that the records it *maintains* about Plaintiff are accurate and complete. Am. Comp. at ¶¶ 68-69. In Count III, Plaintiff stated that DHHS may disseminate the reports on Plaintiff at any time and that DHHS has willfully and intentionally failed to make reasonable efforts to assure that the records it *maintains* about Plaintiff are accurate and complete. Am. Comp. at ¶¶ 75-76. Under the Damages section, Plaintiff stated that DHHS has acted and continues to act willfully and intentionally in *maintaining* and posing a threat of dissemination of the inaccurate and incomplete reports about Plaintiff. Am. Comp. at ¶ 80. Finally, Plaintiff clearly stated that Report No. 1 and Report No. 2 were *replaced* with Reports. No. 4 and 3, respectively. Am. Comp. at ¶¶ 37 and 39. Thus, Plaintiff could not be seeking damages for Reports No. 1 and 2 as those are *not* maintained by DHHS, but were replaced with Reports No. 3 and 4.

The Privacy Act provides that "[a]n action to enforce any liability created under this section may be brought in the district court . . . within two years from the date on which the cause of action arises . . .." 5 U.S.C. § 552a(g)(5). "In a normal Privacy Act claim, the cause of action does not arise and the statute of limitations does not begin to run until the plaintiff knows or should know of the alleged violation." Tijerina v. Walters, 821 F.2d 789, 798 (D.C. Cir. 1987). Since Plaintiff did not bring his action based on Reports No. 1 and 2, Defendant's argument that the statute of limitations has run is meritless, since Reports 3 and 4 were filed with the Data Bank less than 2 years prior to the filing of this suit.

Defendant, however, seems to assert that even if Plaintiff only brought his action based on Reports No. 3 and 4, his action should be dismissed because the appropriate dates to use for purposes of calculating the statute of limitations are the dates that the Plaintiff originally became aware of the reports in 2004, not the later dates on which the "amended reports" were issued. Defendant adds that the "amended reports" describe the same events as the original reports, but simply do so in a more detailed manner.

This argument is meritless. Under Tijerina, first a violation has to occur and second, the plaintiff must know about that violation. That is when the cause of action arises and the statute of limitations begins to run. The cause of action, as is clear from the Amended Complaint, is twofold:

1) the failure of Defendant to maintain Reports 3 and 4 in an accurate and complete manner with a resultant adverse determination;[6] and

2) the failure of Defendant to make reasonable efforts to correct Reports No. 3 and 4 prior to disseminating them.

Reports No. 3 and 4 did not exist until they were filed in March and May of 2006, respectively, bringing the cause of action within the two-year limitation period. What

---

[6] Count II is brought under § 552a(g)(1)(C), not § 552a(g)(1)(D), as demonstrated below.

Defendant misses is the fact that Reports No. 1 and 2 were not simply amended but were *replaced* by Reports 4 and 3, respectively. Am. Comp. at ¶¶ 37 and 39. Further, Report No. 2 was *voided* by the Hospital and expunged from the Data Bank. Am. Comp. at ¶ 37. Defendant cannot possibly force Plaintiff to file his cause of action based on Reports 1 and 2 just so it can argue that the statute of limitations has run. The voiding of Report No. 2, in Defendant's own admission, <u>ended</u> the Secretarial Review of that Report. Plaintiff had to file *a new request* for review of Report No. 3, which replaced Report No. 2.[7] Similarly, Report No. 4 *replaced* Report No. 1, although the latter was not voided by the Hospital. The Data Bank initiated *new reviews* of Reports No. 3 and 4. *See* Declaration of Dr. Oshel at ¶¶ 7-8. It is the Data Bank's subsequent 1) maintenance of inaccurate and incomplete records with a resultant adverse determination and 2) failure to make reasonable efforts to ensure the records' accuracy and completeness that constitute this cause of action.

If Defendant's theory that the statute of limitations should start to run when Plaintiff knew of the original reports, then the following scenarios would shield many an agency from liability and eviscerate the purpose of the Privacy Act:

1) If a practitioner brings a timely suit based on an inaccurate report, and the report is replaced more than 2 years after the filing of the initial one with another report, causing *additional* damage, the practitioner cannot file a new action based on the second report.

2) If an agency procrastinates in its review of a report, as the Data Bank is known to do,[8] the statute of limitations may run before a review is completed; although exhaustion of administrative remedies is not required prior to filing an action for damages under

---

[7] See letter dated March 28, 2006, from Dr. Oshel to Plaintiff's counsel, attached hereto and incorporated herein as Exhibit 4.

[8] In a letter dated December 15, 2005 to Plaintiff's counsel, Mr. Oshel stated that review of this case may take "several months." This statement is a boilerplate sent to all practitioners.

the act, a practitioner should not have to rush to file suit while his case is still under review.

3) If a report is inaccurate but does not cause damages substantial enough to warrant a lawsuit against the Data Bank, and after a prompt request for review by the subject of the report the latter is replaced with one that does cause substantial harm, the statute of limitations may have run.

4) To initiate a dispute, the practitioner must bring the alleged inaccuracy to the reporting entity's attention and request a correction. Motion at 4. If the negotiations between the subject of a report and the reporting agency result in a report being replaced (or even amended) several times over 2 years because of continuing negotiations, by the time the agency is asked to amend the final report, the statute of limitations would have run.

Defendant offers the strange argument that ruling otherwise "would lead to the strange result of encouraging agencies to refrain from changing or correcting records outside the statute of limitations pursuant to valid inquiries for fear of subjecting the agency to liability on claims that were time-barred." In essence, Defendant argues that ruling otherwise would encourage agencies to break the law. Defendant's argument also suggests that it would not amend the record *within* the statute of limitations out of the same fear. Defendant, in other words, admits that the thought of breaking the law by not amending a record does occurs to it. In fact, Defendant is making Plaintiff's case, in that an agency would be encouraged *not to correct a record* because it is shielded from money liability by the statute of limitations if a practitioner, for whatever reason, does not request a correction of a record less than two years after discovery of an inaccuracy[9] -- as if HHS exists not to serve the public but to evade its responsibilities when possible. Even stranger is Defendant's statement that HHS should not

---

[9] The statute of limitations prevents judicial review, but does not prevent agency review.

be penalized for its attempts to address Plaintiff's concerns. Defendant considers that compensating an aggrieved party for Defendant's violation of the law, to the extent that the violation occurred more than 2 years after the filing of a report, is a "penalty," or, put another way, the Privacy Act provides an agency with a free pass to act capriciously more than 2 years after it notifies a practitioner that a report is filed.

Defendant argues that if any Privacy Act violations occurred because of the "amended reports," these violations would only be "continuing violations" arising from the original reports. According to Defendant's theory, Plaintiff's causes of action arose the day it notified Plaintiff of the existence of Reports No. 1 and 2. Defendant is wrong, because no cause of action arose under the Privacy Act from Reports No. 1 and 2.

"In a normal Privacy Act claim, the cause of action does not arise and the statute of limitation does not begin to run until the plaintiff knows or should know of the alleged violation." Tijerina at 798.

Under Tijerina, the cause of action for violation of § 552a(e)(6), created by 552a(g)(1)(D), arose and the statute of limitations began to run after the Data Bank 1) failed to make reasonable efforts to assure the accuracy and completeness of the record; and 2) Plaintiff knew of such failure. Plaintiff has not alleged that the Data Bank has failed to make reasonable efforts to assure the accuracy of Reports No. 1 and 2, nor did he state that he knew of any such failure. What Plaintiff did allege is that Defendant's review of Reports No. 3 and No. 4 was superficial and was not conducted in good faith and that Defendant's efforts in reviewing Reports No. 3 and No. 4 were inadequate and in violation of the Privacy Act, 5 U.S.C. § 552a. Am. Comp. ¶¶ 45-46. This is what constitutes the "failure to make reasonable efforts." Plaintiff did not know about such "failure" until he received letters from the Data Bank informing him of its decision regarding Reports No. 3 and No. 4 and containing evidence pointing towards such failure to make reasonable efforts. Plaintiff received those

letters on May 22, 2006 and June 9, 2006, less than two years before this action was filed. Am. Comp. at ¶¶ 42-43.

Also under Tijerina, the cause of action for violation of § 552a(e)(5), created by § 552a(g)(1)(C), arose and the statute of limitations began to run after the Data Bank 1) maintained an inaccurate and incomplete record; 2) Plaintiff knew that the record maintained was inaccurate and incomplete; and 3) an adverse determination occurred. The adverse determination complained of is the determination by the Data Bank that the facts alleged by the Hospital concerning the actions taken against Plaintiff are true; this occurred when the Data Bank determined that *Reports No. 3 and 4* were accurate and complete. The Data Bank never determined that *Reports No. 1 and 2* were accurate and complete. Thus, there was no cause of action created by the latter reports.

Another point to be made is that the Hospital voided Report No. 2 and filed a new one -- Report No. 3, which was *materially different* from Report No.2. This ended the Review of Report No. 2, as per the Data Bank letter dated March 28, 2006 to Plaintiff. Plaintiff then, following Defendant's own instructions, had to initiate a request to correct Report No. 3. Defendant then refused to make reasonable efforts to do so; *that* is when the violation occurred. When Plaintiff was informed by the Data Bank that it declined to correct Report No. 3, the statute of limitations began to run. A similar argument can be made with respect to Report No. 4, which was filed by the Hospital to replace Report No. 1. Although Report No.1 was not voided, Report No. 4 was *materially different* from it as to constitute a totally different report. The statute of limitations did not start running until the Data Bank declined to correct Report No. 4 and informed Plaintiff of its decision.

Defendant asks the Court to treat this case as it treated Doe. The circumstances in Doe, however, are very different from the case at bar. In Doe, the amended report was not materially different from the previous one but only dealt with a limited issue regarding a

psychiatric exam. In the present case, both reports were materially different from the previous ones. Further, in <u>Doe</u>, the Court considered whether the statute of limitations would be tolled by recurrent violations and determined that it would not be. There, the Court stated:

> "A Privacy Act claim is not tolled by continuing violations." <u>Davis v. United States DOJ, 204 F.3d 723, 726 (7th Cir. 2000)</u> (citing <u>Diliberti [v. USA], 817 F.2d [1259] at 1261</u>).

<u>Doe</u> at 133. However, a closer look at <u>Diliberti</u> shows that that is not what the court stated *verbatim*. The <u>Diliberti</u> court stated:

> Finally, the plaintiff argues that the continuing violation doctrine should toll the statute of limitations. According to the plaintiff, the government's use of the private records to force the plaintiff into early retirement from the civil service on December 31, 1983, was a new and continuing unlawful act, occurring well within two years of the filing of this suit on February 1, 1984. The Tenth Circuit in <u>Bergman</u> rejected the argument that a new cause of action arises upon "each and every subsequent adverse determination based on erroneous records." <u>751 F.2d at 317</u>. The plaintiff has not alleged any new unlawful conduct by the government; he has merely alleged a continuing adverse consequence of prior unlawful conduct. See, *e.g.*, <u>Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)</u> ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation.")

A close reading of <u>Bergman</u> and <u>Diliberti</u> shows that neither court stated that a Privacy Act claim is not tolled by continuing violations. What the courts stated is that continuing adverse *determinations* arising from erroneous records do not constitute continuing violations, and thus do not create new causes of action. In fact, the courts did not advance any opinion as to whether continuing violations toll a Privacy Act claim; they were just ruling that continuing adverse determinations were not equivalent to continuing violations. <u>Davis</u> was the first case in which such statement, that a Privacy Act claim is not tolled by continuing violations, appeared. However, in <u>Davis</u> there was no question of continuing violation raised; the court was just citing caselaw in passing -- it is clear that the statement is a dictum. In fact, the <u>Davis</u> statement referred to <u>Diliberti</u>, which, as shown above, did not address the issue. Thus, it is clear that the statement that a Privacy Act claim is

not tolled by continuing violations, indicates that continuing adverse consequences do not toll

Privacy Act claims. In fact, <u>Doe</u> itself stated:

> Accordingly, a former member of this Court found that "new causes of action do not arise each and every time there is a subsequent adverse determination based on the alleged incorrect records." <u>Szymanski v. US Parole Comm., 870 F. Supp. 377, 378 n. 4 (D.D.C. 1994) (citing Diliberti, 817 F.2d at 1264)</u>.

<u>Doe</u> at 133. However, a new <u>violation</u>, *stricto sensu*, need not toll the statute of limitations,

for it obviously creates a new cause of action. Indeed, this very Court, in <u>Tripp v. U.S.</u>

<u>Department of Defense, 219 F. Supp.2d 85, 93 (D.D.C. 2002)</u>, stated:

> Plaintiff has alleged multiple illegal disclosures by DOD officials. Plaintiff will have the opportunity, after discovery, to attempt to prove via sufficient evidence as many Privacy Act violations as she believes she can prove. Nothing in the statute, nor the precedent cited by defendant, has persuaded this Court to rule as a matter of law that plaintiff must proceed on only one claim.

In any case, this case does not urge any tolling of the statute of limitations on the

basis of continuing violations, because there were no causes of action arising prior to the

Data Bank declining to correct Reports No. 3 and 4. However, even if, *arguendo*, there were

such causes of action, new ones were created in connection with Reports No. 3 and 4 because

they are substantially different from Reports No. 1 and 2.

<u>According to Defendant's theory, if the Hospital or the Data Bank decides, *today*, to amend either Report to include "more details" and make it more inaccurate or incomplete or even totally irrelevant for agency purposes, and informs Plaintiff of its action, Plaintiff has no judicial remedy</u>. This argument is absurd and eviscerates the purpose of the Privacy Act. The

statute starts to run with every violation. *See* <u>Tripp</u>, *supra*.

Moreover, Defendant is estopped from using the defense of statute of limitations. A

defendant who engages in "inequitable conduct" can be equitably estopped from invoking the

statute of limitations. <u>Chung v. U.S. Dep't of Justice, 357 U.S. App. D.C. 152, 333 F.3d 273,</u>

<u>278 (D.C. Cir. 2003)</u>. In <u>Chung</u>, the Court of Appeals for the D.C. Circuit ruled that nothing

prevented the application of equitable tolling against the Government in a Privacy Act claim. Following a similar reasoning as in <u>Chung</u>, nothing should prevent the application of equitable estoppel under the Act. Equitable estoppel in the statute of limitations context prevents a defendant from asserting untimeliness where the defendant has taken active steps to prevent the plaintiff from litigating in time. <u>Smith-Haynie v. District of Columbia, 332 U.S. App. D.C. 182, 155 F.3d 575, 579 (D.C. Cir. 1998)</u>. Here, Defendant did not inform Plaintiff of his right for judicial review of its decisions not to correct the record. Thus, Plaintiff was not informed of his right to sue under the Privacy Act, and was not aware of its statute of limitations until shortly before he filed suit. In this case, Defendant's failure to inform Plaintiff of his rights under the Privacy Act constitutes an "active step" to prevent Plaintiff from suing in time, because the Data Bank was aware, at least since the decision in <u>Doe</u>, if not since the enactment of the Privacy Act, that it has a duty to abide by and provide the protections of the Privacy Act to practitioners and, *inter alia,* inform them of their rights, and has routinely failed to do so. This constitutes intentional fraud by concealment.

Finally, "an affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint." <u>Smith-Haynie v. District of Columbia, 332 U.S. App. D.C. 182, 155 F.3d 575, 578 (D.C. Cir. 1998)</u>. Here, there is an issue whether certain facts are clear from the Complaint. Defendant states that "[t]he amended reports describe the same events as the original reports, but simply do so in a more detailed manner. Am. Compl. ¶¶ 37, 39." Motion at 9. However, the Amended Complaint does not state that the amended reports describe the same events as the original reports. That is Defendant's own conclusion. Since this issue is not clear from the Complaint and may be crucial in determining the merits of Defendant's statue of limitations defense, Defendant should not be allowed to bring his defense in a pre-answer motion.

Therefore, for all the foregoing reasons, the Court should deny Defendant's request to dismiss Counts II and III.

C. <u>Plaintiff did allege that the Data Bank used the reports in question to make a determination regarding Plaintiff</u>:

Defendant argues that to establish a violation of this section, a plaintiff must demonstrate that the agency made some unfair determination about the individual based on an erroneous privacy act record and that Plaintiff has failed to allege that the Data Bank used the reports in question to make any determination about the Plaintiff.

In his Amended Complaint, Plaintiff stated that on May 22, 2006, the Secretary completed its review of Report No. 3 and found it to be accurate, complete, timely and relevant for agency purposes and that on June 9, 2006, the Secretary completed its review of Report No. 4 and found it to be accurate, complete, timely and relevant for agency purposes. Am. Comp. at ¶¶ 42-43. Plaintiff incorporated these paragraphs by reference into Count II. Am. Comp. at ¶ 67. Clearly, by determining that the Reports are accurate and complete, the Data Bank determined that the facts, as reported, reflect the truth, and that they reflect it in a complete manner so as not to leave out any detail that would eviscerate the purpose of reporting. In other words, the Data Bank determined that the facts, as alleged in the Reports, are true; this constitutes a determination that is adverse to Plaintiff. This determination has severely affected Plaintiff in that he has refrained from seeking privileges in any hospital for fear of defamation and denial of privileges with the consequent result that new reports would be filed with the Data Bank by the hospitals. Am. Comp. at ¶ 59. The Data Bank's determination that the facts are true and complete is extremely prejudicial to Plaintiff in his quest to obtain hospital privileges.

Defendant argues that Plaintiff cannot bring Count II under § 552a(g)(1)(D) but under § 552a(g)(1)(C). Plaintiff did intend to bring Count II under § 552a(g)(1)(C); however, a

typographic error occurred where (C) was substituted by (D),[10] which is clear from the fact that, in ¶ 89 of the Am. Comp., Plaintiff stated:

> Under 5 U.S.C. § 552a(g)(4)(B), Plaintiff requests an award of his costs of the action and his reasonable attorney fees incurred in pursuit of his claims under 5 U.S.C. § 552a(g)(1)(C) and (D). (emphasis added)

"All pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(f). Plaintiff should not be penalized for such an easy typographic error to make, and should be allowed to correct the record. Such amendment in no way prejudices Defendant. Further, even if read as an action under 552a(g)(1)(D), the damages alleged are the same as would be alleged under a claim brought under 552a(g)(1)(C), since the damages occurred as a result of the above adverse determination.

Accordingly, Defendant's request to dismiss Count II should be denied.

### DEFENDANT'S EXHIBIT 1

One cannot but wonder why the Data Bank attached to its brief the memorandum opinion issued by the United States District Court for the District of Maryland in a lawsuit initially brought by Plaintiff against Karen-Faye McTavish, one of the attorneys defending the Hospital, in the Circuit Court for Montgomery County in Maryland, and removed by Ms. McTavish to the United States District Court. The suit asserted section 1983 claims of Denial of Due Process, Deprivation of the Equal Protection of the Laws, and various state tort claims. The suit is obviously not relevant to this case, but Defendant's insinuations cannot remain subliminal. Defendant is attempting to gain the Court's sympathy by showing that Plaintiff had previously sued a judge and two attorneys, clearly wanting this Court to dismiss the case, if not based on law, based on the fact that he previously sued a judge. It escaped Defendant that a sister agency, the Department of Justice, has a section dedicated to prosecuting public officials who violate the law and undermine their position, and places

---

[10] The two letters are adjacent on a computer keyboard.

several judges behind bars every year. Judges, like every one else, do violate the law in the discharge of their duties, and because of the power they have and the disastrous consequences resulting from betrayal of the public trust, should promptly be removed from their position and prosecuted. The fact that a judge was sued for prospective declaratory relief, as provided for by 42 U.S.C. § 1983, does not constitute a legal argument for dismissal of a complaint under the Privacy Act, but rather constitutes an attempt to manipulate the Court. The memorandum opinion, however, does illustrate Plaintiff's contention that his lawsuits are being dismissed without due consideration by the courts, denying Plaintiff his day in Court.[11]

It is well known that a court faced with a motion to remand and a motion to dismiss is obligated to consider the motion to remand first, since it has to assure itself that it has jurisdiction. A quick reading of the memorandum opinion issued by the District Court in Maryland shows that the court ruled on a motion to dismiss filed by Ms. McTavish *prior* to ruling on a motion to remand filed concomitantly by Plaintiff. Further, although the Rooker-Feldman doctrine applies only to cases seeking rejection of a judgment of a state court but do not prevent independent claims brought under 42 U.S.C. § 1983,[12] the court determined that the doctrine applied. Then, instead of remanding the case pursuant to 28 U.S.C. 1447(c)[13] after finding lack of subject-matter jurisdiction based on the Rooker-Feldman doctrine,[14] the court dismissed the case *with prejudice*, although "[w]hen a federal court concludes that it

---

[11] In addition, in retaliation to Plaintiff's suit against Judge Swersky and the two attorneys, the Arlington County Circuit Court entered a judgment for $616,000 against Plaintiff when he moved to nonsuit his cases.
[12] *See* Nesses v. Shepard, 68 F.3d 1003 (7th Cir., 1995).
[13] 28 U.S.C. 1447(c) states, in relevant part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."
[14] *See* Friedman's, Inc. v. Dunlap, 290 F.3d 191, 196 (4th Cir. 2002) ("Because the Rooker-Feldman doctrine is jurisdictional, we are obliged to address it before proceeding further in our analysis."); Plyler v. Moore, 129 F.3d 728, 731 (4th Cir. 1997) ("Under the Rooker-Feldman doctrine, lower federal courts do not have jurisdiction to review state-court decisions."); Jordahl v. Democratic Party of Va., 122 F.3d 192, 197 n.5 (4th Cir. 1997) (noting that the Rooker-Feldman doctrine is a jurisdictional matter that a court is empowered to raise *sua sponte*).

31

lacks subject matter jurisdiction over a case, it is precluded from rendering any judgments on the merits of the case." Christopher v. Stanley-Bostitch, Inc., 240 F.3d 95, 100 (1st Cir., 2001). *See also* Willy v. Coastal Corp., 503 U.S. 131, 137, 117 L. Ed. 2d 280, 112 S. Ct. 1076 (1992) ("A final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it."); In re Orthopedic "Bone Screw" Prods. Liab. Litig., 132 F.3d 152, 155 (3d Cir. 1997) ("If a court [ ] determines that it lacks subject matter jurisdiction, it cannot decide the case on the merits."); Wages v. I.R.S., 915 F.2d 1230, 1234 (9th Cir. 1990) ("We have held that a judge ordering a dismissal based upon lack of subject matter jurisdiction retains no power to make judgments relating to the merits of the case.") (internal quotation marks omitted). After dismissing the case with prejudice, the court then considered and denied the motion to remand "as [the] Court has dismissed all five of Plaintiff's claims, with prejudice."

Such has been the type of consideration that various courts have provided Plaintiff's lawsuits. This Court is now being presented with an opportunity to make a big dent in the practice of bad-faith peer review and in rescuing shammed physicians -- thus protecting patients -- from the consequences of bad-faith peer review. It is respectfully urged to take it.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motion.

## REQUEST FOR ORAL HEARING

Plaintiff hereby makes a request for oral hearing pursuant to LCvR 7.

Respectfully submitted,

Ziad Akl, M.D., F.A.C.P.
10410 Glen Road
Potomac, MD 20854
*Pro se*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZIAD AKL, MD ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-0461 (RBW) |
| ) | |
| HONORABLE MICHAEL LEAVITT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. HHS informed Plaintiff of its decision regarding Report No. 3 on May 22, 2006, but did not advise him of his right to an administrative appeal. Exhibit 5. Declaration of Ziad Akl, MD, ¶ 1.

2. HHS informed Plaintiff of its decision regarding Report No. 4 on June 9, 2006, but did not advise him of his right to an administrative appeal. Exhibit 5. Declaration of Ziad Akl, MD, ¶ 1.

3. HHS regulations do not provide for an appeal of a decision regarding a request for correction of a record. Exhibit 2, at F-6, and 45 C.F.R. § 60.14.

4. Report No. 3 does not contain the same information as Report No. 2 and is materially different from it. Exhibit 5. Declaration of Ziad Akl, MD, ¶ 2.

5. Report No. 4 does not contain the same information as Report No. 1 and is materially different from it. Exhibit 5. Declaration of Ziad Akl, MD, ¶ 3.

Respectfully submitted,

Ziad Akl, M.D., F.A.C.P.
10410 Glen Road
Potomac, MD 20854
*Pro se*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2008, a copy of the foregoing was sent via first class mail, postage-prepaid, to:

Robin Meriweather
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530

Ziad AKL, M.D., F.A.C.P.
10410 Glen Road
Potomac, MD 20854
*Pro se*

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FOURTH JUDICIAL DISTRICT AT FAIRBANKS

DAVID M. ODOM, M.D.,                    )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     )
                                        )       Filed in the Trial Courts
FAIRBANKS MEMORIAL HOSPITAL,            )    STATE OF ALASKA, FOURTH DISTRICT
LUTHERAN HEALTH SYSTEMS, INC.,          )
WESTERN HEALTH NETWORK, INC.,           )
JAMES H. GINGERICH, SUSAN               )          APR  5 2001
MCLANE, LINDA SMITH, RONALD L.          )
BLISS, HOI P. LEE, M.D.,                )      Clerk of the Trial Courts
STEVE E. MANCILL, M.D., JERRY           )
A. PERISHO, M.D., RANDALL K.            )    By_____Deputy
MCGREGOR, M.D., LAWRENCE W.             )
STINSON, JR., M.D., ANESTHESIA          )
ASSOCIATES, INC., WILLIAM F.            )
STODDARD, M.D., DANNY R.                )
ROBINETTE, M.D.,                        )
                                        )
        Defendants.                     )
_____)

Case No. 4FA-93-2901 Civil

### MEMORANDUM OPINION AND ORDER

Defendants seek summary judgment in this case on the basis of federal legislation which immunizes members of a professional review body from damages arising out of a professional review action, if that action is taken:

> (1)  in the reasonable belief that the action was in furtherance of quality health care,

> (2)  after a reasonable effort to obtain the facts of the matter,

> (3)  after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

> (4)  in the reasonable belief that the action was warranted by the facts known after such

> reasonable effort to obtain facts and after
> meeting the requirement of paragraph (3).

42 U.S.C. §11112(a).  The same provision also includes a burden-shifting presumption that these standards have been met.  Id.
This legislation has been the subject of numerous idiosyncratic interpretations in the federal courts and the courts of other states.

First, and foremost, despite the plain language[1] of the provision in issue, it is represented that the federal courts of appeals "have uniformly applied an objective standard in assessing compliance," to which "bad faith" is irrelevant.  Mathews v. Lancaster General Hospital, 87 F.3d 624, 635 (3d Cir. 1996).  It is not at all clear what this means, or how it can be accomplished.[2]  Is a peer review board that makes no "effort to

---

[1] Generally speaking, a "reasonable belief" is a belief that is both actually and reasonably held.  This language, under normal circumstances, would require satisfaction of both a subjective and an objective standard.

[2] According to the Mathews court:

> [T]his standard "will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients."

Mathews v. Lancaster General Hospital, 87 F.3d 624, 635 (3d Cir. 1996), quoting H.R. Rep. No. 903 99th Cong. 2d Sess. 10 (1986).
This explanation suggests that, to be immune, a panel has to actually make a "reasonable effort to obtain the facts of the matter."  If so, the standard is both "subjective"--in that the panel must actually make the effort to obtain information--and "objective"--in that the effort must be reasonable.  The same is

Odom v. Lee
4FA-93-2901 Civil
Page 2

obtain the facts of the matter" immune if the facts, if known, would have produced the same result? Is action taken by a body that affirmatively believes the action not to be "warranted by the facts known" immune if other unknown facts would support it? Under scrutiny, this "objective standard" degenerates into nothing. And the fact is, as plaintiff points out, that strict adherence to it is rarely even attempted, let alone achieved.

It is simply impossible to accept that in principle, a sham review, based upon no facts, and motivated by animosity and self interest, would immunize the participants if a properly motivated and informed body "would have" or "could have" reached the same result. What if a peer review body decided to forego not only fact finding and rational consideration of the issues, but notice to the subject professional himself or herself? Could the members claim immunity by attempting to show that the subject professional would have fared no better if permitted to participate in the process? This so called "objective standard" that is "uniformly applied" by the federal appellate courts makes no sense, and is not even susceptible to meaningful application. <u>See, e.g.,</u> <u>Fobbs v. Holy Cross Health System Corp.</u>, 789 F. Supp. 1054, 1064 (E.D. Cal. 1992).

It has been established, as a matter of law, that the

_____

true, presumably, of the requirement of "adequate notice and hearing procedures." Certainly, then, "bad faith" is relevant to at least these two prongs of the immunity test. Why a "reasonable effort" must be assessed both subjectively and objectively while a "reasonable belief" must not is a great mystery.

Odom v. Lee
4FA-93-2901 Civil
Page 3

1908

professional review action in the present case may have been the result of "a conspiracy to restrain trade," undertaken in an attempt "to monopolize the anesthesiology practice at FMH." <u>Odom v. Lee</u>, 999 P.2d 755, 764 (Alaska 2000). Given those possibilities, it is equally possible that the defendants did not have a "reasonable belief that the action was in furtherance of quality health care"; that they did not make a "reasonable effort to obtain the facts of the matter"; and that they did not have a "reasonable belief that the action was warranted" by the facts they did not know after failing to make a "reasonable effort to obtain" them. Stated in more practical and coherent terms, it is entirely possible, given the Alaska Supreme Court's observations on the subject, that Dr. Odom was deprived of the "fairness" that this process is intended to insure. <u>Austin v. McNamara</u>, 979 F.2d 728, 733 (9th Cir. 1992). Reasonable minds could differ on the question of whether the utterly incoherent "objective standard" that the federal appellate courts claim to apply, or the more comprehensible "fairness" standard that they actually do apply, was met in this case. This fact is dispositive of defendants' Motion for Summary Judgment.

There is, however, one additional--and equally strange-- inconsistency among the cases that must be addressed. According to the Third Circuit:

> When a defendant moves for summary judgment on the basis of HCQIA immunity, the proper inquiry is whether the plaintiff has produced "evidence that would allow a reasonable jury

Odom v. Lee
4FA-93-2901 Civil
Page 4

> to conclude that the [defendant's] peer review
> disciplinary process failed to meet the
> standards of the [HCQIA]."

Perez v. Pottstown Memorial Medical Center, 1998 WL 464916 (E.D.

Pa. 1998), quoting Mathews v. Lancaster General Hospital, 87 F.2d

624, 633 3d Cir. (1996). Clearly, a jury verdict on the question

of immunity is contemplated. See also Brown v. Presbyterian

Healthcare Services, 101 F.3d 1324, 1333 (10th Cir. 1996); Islami

v. Covenant Medical Center, Inc., 822 F. Supp. 1361, 1378 (N.D.

Iowa 1992). But the Eleventh Circuit says:

> A district court should consider the issue of
> HCQIA immunity from damages at the summary
> judgment stage. If it determines that the
> defendant is not entitled to such protection,
> then the merits of the case should be
> submitted to the jury without reference to the
> immunity issue. If there are disputed
> subsidiary issues of fact concerning HCQIA
> immunity, such as whether the disciplined
> physician was given adequate notice of the
> charges and the appropriate opportunity to be
> heard, the court may ask the jury to resolve
> the subsidiary factual questions by responding
> to special interrogatories. Under no
> circumstances should the ultimate question of
> whether the defendant is immune from monetary
> liability under HCQIA be submitted to the
> jury.

Bryan v. James E. Holmes Regional Medical Center, 33 F.3d 1318,

1333 (11th Cir. 1994). Whatever else the Bryan court might intend

to communicate in this holding, it at least makes clear elsewhere

that "although immunity may be determined at the summary judgment

stage, resolution of that issue may be deferred until or after

trial if the standards of Rule 56 cannot be satisfied." Id. at

1332. On either view, then, this court, having found that "the

Odom v. Lee
4FA-93-2901 Civil
Page 5

standards of Rule 56 cannot be satisfied," can appropriately reserve ruling on the question of whether immunity is to be determined by the court or the jury until after trial. It will do so.

The court will not speculate as to how the Alaska Supreme Court might interpret this bizarre body of law. It is, however, quite confident--given what that court has already had to say about the case--that a grant of summary judgment on the question of HCQIA immunity would not be affirmed on appeal. Accordingly, defendants' Motion for Summary Judgment is DENIED. Given that their interpretation of the law, if correct, would almost certainly save enormous amounts of time and resources, they are encouraged to seek interlocutory review of this ruling.

Dated this **5th** day of April, 2001.

Charles R. Pengilly
Superior Court Judge

I certify that a copy of the foregoing was distributed via:
MAIL
[X] U.S. Postal Svc. BLISS, Lazary, White, Barber
[ ] Other_____
HAND DELIVERY
[X] Counter Svc. Niewohner, Foster
[ ] Pick Up Bin_____
[ ] Fax_____
[ ] Other_____
By:_____ Date: 4-6-01
Clerk

Odom v. Lee
4FA-93-2901 Civil
Page 6

# National Practitioner Data Bank
# GUIDEBOOK



U.S. Department of Health and Human Services
Health Resources and Services Administration
Division of Quality Assurance
7519 Standish Place
Suite 300
Rockville, Maryland  20857

Publication No. HRSA-95-255

## Preface

The *National Practitioner Data Bank Guidebook* is meant to serve as a resource for the users of the National Practitioner Data Bank (NPDB). It is one of a number of efforts to inform the United States health care community about the NPDB and what is required to comply with the requirements established by Title IV of Public Law 99-660, the *Health Care Quality Improvement Act of 1986*, as amended. This *Guidebook* contains information that authorized users need to interact with the NPDB. Authorized users include State licensing authorities; medical malpractice payers; hospitals and other health care entities; and physicians, dentists, and other licensed health care practitioners.

Final regulations governing the NPDB were published in the *Federal Register* on October 17, 1989, and are codified at 45 CFR Part 60. The U.S. Department of Health and Human Services (HHS) is responsible for implementing the NPDB.

This *Guidebook* is divided into broad topical sections. This introduction contains general information on the NPDB, which includes its history, the laws and regulations that govern it, and other information for authorized users. Chapter H, Information Sources, provides a variety of sources to facilitate user interaction with the NPDB. The Glossary, included as Appendix A, defines terms helpful in understanding NPDB operations, including querying and reporting requirements.

This edition of the *NPDB Guidebook* reflects the entire range of NPDB policies and operations, including those that have changed or expanded since the NPDB

opened in September 1990. This comprehensive *Guidebook* is for both new and experienced entities that are eligible to participate in the NPDB; it supersedes all previous versions.

## Background

The legislation that led to the creation of the NPDB was enacted because the U.S. Congress perceived that the increasing occurrence of medical malpractice litigation and the need to improve the quality of medical care had become nationwide problems that warranted greater efforts than those that could be undertaken by any individual State. Effective professional peer review can restrict the ability of incompetent practitioners to move from State to State without disclosure or discovery of previous damaging or incompetent performance. The Congress felt that the threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discouraged physicians and dentists from participating in effective professional peer review. Therefore, Congress sought to provide incentive and protection for physicians and dentists engaging in effective professional peer review.

Hearings were held in the U.S. House of Representatives on the proposed legislation, the *Health Care Quality Improvement Act of 1986*, on March 18 and July 15, 1986, by the Subcommittee on Health and the Environment, Committee on Energy and Commerce, and on October 8 and 9, 1986, by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary. At these public hearings, testimony was given by physicians, attorneys, insurance

## The Dispute Process

The NPDB is committed to maintaining accurate information and ensuring that health care practitioners are informed when adverse actions are reported about them. When the NPDB receives a report, the IQRS processes the information exactly as it is submitted by the reporting entity. Reporting entities are responsible for the accuracy of the information they report.

When the NPDB processes a report, a *Report Verification Document* is sent electronically to the reporting entity via the IQRS and can be accessed at the *Report Status* screen. A *Notification of a Report in the Data Bank(s)* is mailed to the subject. The subject should review the report for accuracy, including such information as current address and place of employment.

**Subjects may not submit changes to reports.** If any information in a report is inaccurate, the subject must request that the reporting entity file a correction to the report. The NPDB is prohibited by law from modifying information submitted in reports.

If the reporting entity declines to change the report, the subject may initiate a dispute of the report through the dispute process, add a statement to the report, or both. The dispute process is not an avenue to protest a payment or to appeal the underlying reasons of an adverse action affecting the subject's license, clinical privileges, or professional society membership. Neither the merits of a medical malpractice claim nor the appropriateness of, or basis for, an adverse action may be disputed.

Subjects who wish to add a statement to and/or dispute the factual accuracy of a report should follow the instructions on the *Notification of a Report in the Data Bank(s)*. Subjects who do not have the original *Notification of a Report in the Data Bank(s)* may obtain a *Subject Statement and Dispute Initiation* form from the NPDB-HIPDB web site at *www.npdb-hipdb.com*.

### Subject Statements

The subject of a report may add a statement to the report at any time. When the NPDB processes a statement, notification of the statement is sent to all queriers who received the report, and is included with the report when it is released to future queriers. Subject Statements are limited to 2,000 characters, including spaces and punctuation. Drafting a statement in accordance with the character limits ensures that the statement contains the information a subject deems most important. All characters beyond 2,000 are truncated. Subject Statements cannot include any names, addresses, or phone numbers, including those of patients.

A Subject Statement is part of the specific report it is filed for. If the report is changed by the reporting entity, the statement attached to the report also is removed. If a statement is needed with the new report, a new statement that references the Data Bank Control Number (DCN) of the new report must be submitted.

**Dispute Overview (2 of 2)**



## Secretarial Review

If the reporting entity declines to change the disputed Adverse Action Report or Medical Malpractice Payment Report or takes no action, the subject may request that the Secretary of HHS review the disputed report. The Secretary reviews disputed reports only for accuracy of factual information and to ensure that the information was required to be reported.

The Secretary does not review the merits of a medical malpractice claim in the case of a payment or the appropriateness of, or basis for, a health care entity's professional review action or a State licensing board's action.

To request Secretarial Review of a disputed report, the subject must sign and return to the NPDB the *Instructions for Review of the Disputed Report by the Secretary of the U.S. Department of Health and Human Services* attached to the *Report Revised, Voided, or Status Changed* document related to the disputed report. The dispute and any accompanying documentation must be sent to the NPDB, not directly to the Secretary.

The subject also must:

- State clearly and briefly in writing which **facts** are in dispute and what the subject believes are the facts.

- Submit documentation substantiating that the reporting entity's information is inaccurate. Documentation must directly relate to the facts in dispute and substantially contribute to a determination of the factual accuracy of the report. Documentation may not exceed 10 pages, including attachments and exhibits.

- Submit proof that the subject attempted to resolve the disagreement with the reporting entity, but was unsuccessful. Proof may be a copy of the subject's correspondence to the reporting entity and the entity's response, if any.

Case 1:08-cv-00461-RBW    Document 10-3    Filed 08/29/2008    Page 5 of 5

## Reconsideration of the Secretary's Decisions on Disputes

Although HHS does not have a formal appeals process for reconsideration of the Secretary's decisions on disputes, HHS does review such requests. The subject must submit a written request for reconsideration to the office that issued the Secretary's determination. The subject should be specific about any new information that was unavailable at the time of Secretarial Review and which issues the practitioner believes were not appropriately considered during the review process. The Secretary will either affirm the prior determination or issue a revised finding. HHS, however, gives priority to initial requests for Secretarial Review.

## Improper Requests for Secretarial Review

A request for Secretarial Review is considered improper when the report in question has not previously been disputed by the subject. Before requesting Secretarial Review, a subject must first attempt to resolve the disagreement with the reporting entity and then may dispute the report according to the instructions provided on the *Notification of a Report in the Data Bank(s)* document.

If a subject submits an improper request for Secretarial Review, the NPDB will notify the subject that the report must first be disputed and resolution attempted with the reporting entity.

## Examples of Disputes

### Due Process - Alleged Denial

**Example:** A practitioner alleged that an entity, during professional review, denied the practitioner due process because the reviewers ignored the testimony of medical experts or other witnesses called to prove various points the practitioner felt important to the defense.

**Outcome:** The Secretary determined that the dispute request was outside the scope of review and made an entry to that effect in the report. The dispute notation was removed from the report.

### Due Process - Legal Action Pending

**Example:** A practitioner disputed a report on the revocation of his or her clinical privileges by a hospital on the basis that due process was denied during professional review. The practitioner further stated that since he or she had initiated a legal action against the hospital regarding the due process, the report should be removed from the NPDB until legal action is resolved.

**Outcome:** The Secretary determined that the dispute request was outside the scope of review. The Secretary additionally stated that if a court action resulted in a reportable change to the action previously reported, a second report must be submitted by the reporting entity. This new report could make corrections, be a revision to the action, or be a void of the prior report.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE, D.M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 02-2193 (RBW) |
| | ) |
| TOMMY G. THOMPSON, | ) |
| Director, Department of Health | ) |
| and Human Services | ) |
| | ) |
| Defendant. | ) |

## ORDER

In accordance with the Court's reasoning that will be set forth in its Memorandum Opinion to be subsequently issued by the Court, it is hereby

**ORDERED** that summary judgment is granted in favor of the plaintiff in part because the Court concludes that the additional protections of the Privacy Act apply to the Health Care Quality Improvement Act. It is further

**ORDERED** that the Defendants Motion for Summary Judgment is granted in part because the plaintiff's Privacy Act claims are barred by the running of the Privacy Act's two year statute of limitations. It is further

**ORDERED** that this action is dismissed without prejudice.

**SO ORDERED** this 30th day of July 2004

REGGIE B. WALTON
United States District Judge



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Health Resources and Services Administration

Bureau of Health Professions

Rockville, Maryland 20857

**Privileged and Confidential**



**MAR 2 8 2006**

J. Clayton Culotta
Culotta and Culotta
1615 L Street NW
Washington, DC 20036

Dear Mr. Culotta:

We are responding to your letter dated March 14, 2006, and received by this office on March 16, 2006. You requested further clarification regarding the National Practitioner Data Bank's (NPDB) continued dissemination of Dr. Ziad Akl's NPDB report.

Please note that the Virginia Hospital Center has voided Dr. Akl's Revision to Action report and filed a replacement. The original Revision to Action report is no longer being distributed by the NPDB. Only the replacement report will be released to authorized queriers. The NPDB mailed a copy of the void notice and the replacement report to Dr. Akl as soon as they were processed into the NPDB.

The voiding of the original Revision to Action report automatically ended the Secretarial Review of that report. However, we will expedite the elevation of the replacement report to Secretarial Review status if Dr. Akl remains unsatisfied. Please notify us in writing if Dr. Akl wishes us to conduct a Secretarial Review of the replacement Revision to Action report. We will ensure that the NPDB elevates the report to Secretarial Review status and informs any authorized queriers that may have received a copy of the report that it is disputed and under review.

As we had indicated in our previous correspondence, the Privacy Act and the NPDB law and regulations do not require the NPDB to cease disseminating reports during the Secretarial Review process. You indicated in your letter that "pursuant to 5 U.S.C. § 552a(e)(6), an agency is required, 'prior to disseminating any record about an individual to any person other than an agency . . . (to) make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes.'" The NPDB takes several measures prior to the dissemination of any report to comply with applicable requirements, including, but not limited to, requiring the submitting entity to certify that the information in the report is true and correct.

The provisions of the Privacy Act (5 U.S.C. § 552a(d)) which permit individuals to request an amendment of Privacy Act records, do not require the ceasing of dissemination of the records in

J. Clayton Culotta
re: Dr. Ziad Akl
page 2

dispute. In many ways, the Secretarial Review process of the NPDB provides more rights to individuals requesting an amendment of records than the Privacy Act. For instance, unlike the Privacy Act, the NPDB permits an individual to add a statement to a report at any time.

Sincerely,

Robert E. Oshel, Ph.D.
Associate Chief
Practitioner Data Banks Branch

cc:    Dr. Ziad Akl
       Virginia Hospital Center

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ZIAD AKL, MD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0461 (RBW) |
| | ) | |
| HONORABLE MICHAEL LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DECLARATION OF PLAINTIFF ZIAD AKL

I, Ziad Akl, MD, hereby declare as follows:

1) The U.S. Department of Health and Human Services did not advise me of any right to
   an administrative appeal of any disputed report kept with the National Practitioner
   Data Bank.

2) Report No. 3, as defined in the First Amended Complaint, Civil Action No. 08-0461,
   does not contain the same information as Report No. 2, defined in the same
   complaint, and is materially different from it.

3) Report No. 4, as defined in the First Amended Complaint, Civil Action No. 08-0461,
   does not contain the same information as Report No. 1, defined in the same
   complaint, and is materially different from it.


   Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing
is true and correct. Executed this 29th day of August, 2008.


_____
Ziad Akl, MD, FACP

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZIAD AKL, MD                               )
                                           )
    Plaintiff,                         )
                                           )
    v.                                 )          Civil Action No. 08-0461 (RBW)
                                           )
HONORABLE MICHAEL LEAVITT,                 )
                                           )
    Defendant.                         )
_____ )

## ORDER

    The Court having considered Defendant's Motion To Dismiss Or In The Alternative For Summary Judgment, Plaintiff's Opposition, Defendant's Reply and all material submitted therewith, and finding good cause to deny the Motion, it is hereby

    ORDERED that Defendant's Motion is DENIED.

Dated: _____

                                      _____
                                        The Honorable

Copies to:

Ziad Akl
10410 Glen Road
Potomac, MD 20854

Robin Meriweather
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530